# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

------------------------------------------------------------X

ONE BEACON AMERICA INSURANCE COMPANY,

Plaintiff,

C.A. No.: 1:07-CV-00370-S-DLM

vs.

H.R.M., INC. (d/b/a SAFE/SEA MARINE RESCUE & ASSISTANCE),

Defendant.

------------------------------------------------------------X

**DECLARATION OF MICHAEL J. DALY, ESQ.**

Michael J. Daly, Esq. hereby declares under penalty of perjury as follows:

1. I am an attorney with Vetter & White, counsel for defendant H.R.M., Inc. d/b/a Safe/Sea. I make this Declaration in support of H.R.M., Inc.'s Memorandum of Law In Opposition to Complaint to Vacate & Modify the Final Arbitration Award Issued by the Boat Owners' Association of the United States And in Support of Cross-Motion to Confirm. I make this Declaration on personal knowledge.

2. Attached hereto as Exhibit "A" is a true and accurate copy of H.R.M., Inc.'s Initial Submission in the underlying arbitration.

3. Attached hereto as Exhibit "B" is a true and accurate copy of H.R.M., Inc.'s Rebuttal Submission in the underlying arbitration.

4. Attached hereto as Exhibit "C" is a true and accurate copy of the Salvage Arbitration Plan.

5. In the interest of economy, the somewhat voluminous exhibits accompanying the Initial Submission and Rebuttal Submission are not attached, but can be provided at the Court's request.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Providence, Rhode Island, October 19, 2007

/s/ Michael J. Daly
Michael J. Daly, Esq.

# EXHIBIT A

**Petitioner's Salvage Award Presentation**
April 9, 2007

Case No.: 06-1228

---

H.R.M., INC. D/B/A SAFE/SEA,

Petitioner,

vs.

M/V SPRAY, *her engines, tackle, apparel, furnishings, equipment, etc.*, and DAVID PICKERING,

Respondents.

---

# PETITIONER'S ARBITRATION MEMORANDUM

## Introduction

This arbitration concerns a claim of salvage as a result of services rendered to a vessel flooding with seawater. Pursuant to a Standard Form Marine Salvage Contract signed by the vessel's owner, Petitioner, H.R.M., Inc. d/b/a Safe/Sea (hereinafter "HRM"), a professional marine salvor, seeks a salvage award, an equitable uplift, arbitration fees, and interest as well as attorneys' fees and costs.[1]

## Statement Of Facts

1. HRM is a Rhode Island corporation which provides marine towing and salvage services on the waters of Narragansett Bay, Block Island Sound, Rhode Island Sound, and the Atlantic Ocean. HRM maintains full-time watch standing 24 hours a day, 365 days a year. It

---

1 HRM is deemed to hold "professional salvor" status. *See, e.g.*, In the Matter of the M/Y SHOPPING SPREE, 1993 A.M.C. 1296 (Boston, Mass. Aug. 4, 1992).

continuously monitors marine radio frequencies, e-mail and telephone traffic and stands ready, if called upon or upon identifying a vessel in peril, to respond to any marine emergency that might occur in its covered waters.

2. HRM maintains a fleet of six (6) fully equipped, purpose-built salvage vessels and other support equipment, such as vehicles, radios, communications gear and computers. The value of this equipment at the time of the instant salvage was over one million dollars ($1.0 Million).

3. HRM maintains a full-time base of operations in Wickford Harbor, RI, and other operational bases at Block Island, RI and Point Judith, RI, the latter two bases being manned on a seasonal basis. HRM employs nine (9) United States Coast Guard licensed captains to man its vessels (each of whom hold specialized endorsements on their licenses to engage in marine commercial assistance), and various other personnel to support its vessels and salvage operations.

4. As a result of HRM's routine salvage patrol and salvage watch standing activities, on September 23, 2006 company resources were immediately available to respond to the report of the vessel's owner that the M/V SPRAY was taking on seawater and was unable to control the flooding.

5. Specifically, at approximately 1600 hrs., Captain Andrew Casey, aboard HRM's purpose-built, salvage vessel, the M/V Safe/Sea Salvor ("Salvage Vessel") diverted from a prior towing project in Greenwich Bay to respond to the M/V SPRAY's location on the "A+ Dock" at Apponaug Harbor Marina a/k/a Dickerson's Marina, Inc. in Warwick, Rhode Island.[2]

---

2 By way of geographic reference, this marina is located in approximately seventeen (17) miles from Newport Harbor.

6. Running at the Salvage Vessel's best speed of 42 knots, HRM arrived on scene with the M/V SPRAY at approximately 1605 hours.

7. Captain Casey found the M/V SPRAY to be heavily flooded.

8. Captain Casey presented the vessel's owner with HRM's Rhode Island Standard Form Marine Salvage Contract which contract was signed by the owner.

9. Thereafter, Captain Casey deployed, among other things, two dewatering pumps. The first pump was positioned in the engine room space while, at great risk to Captain Casey, the second pump was positioned inside the flooded vessel in the vicinity of the vessel's cabin sole.

10. HRM thereafter successfully lowered the seawater level in the M/V SPRAY such that it could be moved to the travel-lift well for an emergency haul-out.

11. On September 23, 2006 at 1745 hrs., the M/V SPRAY's owner (David Pickering) signed a Redelivery Certificate acknowledging that HRM's services had been carried out to his satisfaction and confirming redelivery of the M/V SPRAY.

**Procedural History**

12. On October 9, 2006, HRM invoiced the owner of the M/V SPRAY in the amount of $11,000.00.[3]

13. On October 12, 2006, the vessel's insurer acknowledged receipt of the invoice and represented that it was being "reviewed for proper response."

14. On November 20, 2006, and without any documentary support, the vessel's insurer rejected HRM's invoice on the basis that the services provided did not give rise to a claim of pure salvage.

[3] HRM subsequently issued an Invoice in the amount of $500.00 representing its scheduled rate for towage for the M/V SPRAY from its homeport to another marina for repairs all of which was accomplished at the request of the vessel owner. A copy of the subsequent Invoice is annexed to the Declaration of John K. Fulweiler, Esq.

15. On November 21, 2006, HRM demanded arbitration in accord with its Salvage Contract and requested that the vessel's insurer provide it with the initial disclosures contemplated under the BoatU.S. Salvage Arbitration Plan an excerpt of which is set forth below:

> 2. If requested by the Salvor, or in the event of any disagreement over the reasonableness of the Salvor's billing, the Underwriter (or an uninsured Owner, if applicable) shall disclose, without prejudice, the pre-casualty current market value and insured value of the salved vessel and its equipment as well as the believed post-casualty, pre-repair fair market value "as is" (after salvage but before repairs). Any supporting information or opinions obtained from a marine survey of the yacht or repair facility estimates or invoices shall also be disclosed as soon as practicable. Any Coast Guard or Marine Patrol accident reports shall also be provided to Salvor if requested.

(Salvage Arbitration Plan, § B, p. 3)

As of this writing, and although demanded, no such disclosures have been produced.

16. On December 11, 2006, a law firm (Clinton & Muzyka, P.C.) representing the M/V SPRAY and its owner advised HRM of its involvement and presented HRM with a Letter of Undertaking in the amount of $16,500.00.

17. On February 21, 2007, and 92 days after HRM demanded arbitration and following HRM's numerous subsequent demands, the vessel interests submitted their Agreement to Arbitrate form thereby triggering the herein briefing schedule.

## Law and Argument

## AUTHORITIES SUPPORTING AN AWARD OF SALVAGE TO OFFSHORE

### I. Elements of a Salvage Claim

In order to establish a valid salvage claim, a salvor must establish three elements: 1) a marine peril; 2) services voluntarily rendered; and 3) success, in whole or in part. *See* The Sabine, 101 U.S. 384 (1879); Klein v. Unidentified and Abandoned Sailing Vessel, 1985 A.M.C. 2970, 2975, 758 F.2d 1511 (11th Cir. 1985).

As demonstrated herein, HRM submits that each of these three elements were present in conjunction with its September 23, 2006 salvage of the M/V SPRAY, and as such, it is entitled to a salvage award for its efforts.

A. <u>The Peril</u>

Federal courts sitting in admiralty have defined maritime peril as:

> To constitute a maritime peril, it is not necessary that the danger be actual or imminent; it is sufficient if, at the time assistance was rendered, the vessel was stranded so that it was subject to the potential danger of damage or destruction. A vessel driven aground on a beach in the area involved must be considered as in a state of peril. Exposed as she is to wind, weather, waves, it does not require extensive reflection to realize that as long as she remains in such a hapless position, further damage and eventual breaking up may ensue.

<u>McNabb v. O.S. Bowfin</u>, 565 F. Supp. 22 (W.D. Wash. 1983).

A maritime peril does not have to be necessarily "immediate" or "absolute", so long as it is "reasonably to be apprehended", *e.g.*, the vessel or other property is subject to potential danger or damage. <u>Faneuil Advisors, Inc. v. O/S Sea Hawk</u>, 50 F.3d 88, 92 (1st Cir. 1995); <u>Fort Myers Shell and Dredging Co. v. Barge NBC 512</u>, 404 F.2d 137 (5th Cir. 1969); <u>Sobonis v. National Defender</u>, 28 F.Supp. 631, 1969 AMC 1219 (S.D.N.Y. 1960).

A vessel driven aground on rocks, shoals or reefs or, as in the instant case, a vessel taking on water are classic examples of ships in maritime peril and they must be considered to be in a state of peril as a matter of law. 3A <u>Benedict on Admiralty</u> § 64 at pp. 5-4; <u>Unnamed but Identifiable Master & Crew etc. v. Certain Unnamed Motor Vessel etc.</u>, 592 F. Supp. 1191 (S.D.Fla. 1984) (finding vessel taking on water to be in peril.)

The M/V SPRAY's state of peril is clearly demonstrated by the fact that the vessel was taking on seawater to such a degree that its owner requested assistance from HRM. Had the M/V

SPRAY not received HRM's assistance, the vessel would have sustained serious and significant damage to its engine room, mechanicals and electricals and would likely have been a total loss.

### B. Voluntary Service

The second element of a valid salvage claim is voluntary service. The "no cure-no pay" clause contained in HRM's Standard Form Marine Salvage Contract ("Salvage Contract") is evidence of voluntary service.

The "no cure-no pay" clause requires that the salvor must rescue the vessel in order to qualify for an award. The agreement is binding only if the salvor rescues the vessel. "It must be borne in mind that the salvor depends wholly, for any compensation, upon success. If he fail, never mind what his enterprise, labors, sacrifices, damage to property, or injury to person, he can get nothing . . . He must save because he can ask to share what is saved." Taylor v. 42 Foot Egg Harbor Hull, 1995 AMC 582 (D.N.J. 1994) citing Scott v. The Clara E. Bergen, 21 F.Cas. 816, 817 (D.S.C. 1882). The "no cure-no pay" agreement therefore is purely voluntary and does not compel payment unless the plaintiff is successful. Id.

Clearly, HRM had no legal obligation to render assistance to the M/V SPRAY. Furthermore, and as set forth above, the "no cure—no pay" clause contained in HRM's Salvage Contract is evidence of voluntary service as a matter of law.

### C. Success

The third and final element of a valid salvage claim is success. Success is essential if compensation is to be earned. Without success there can be no salvage award. The Blackwall, 77 U.S. 1 (1869).

Here, there is no argument that HRM was successful in staging a salvage operation which resulted in the controlling of the incoming seawater and the ultimate identification of its source.

HRM's promptitude, experience and professionalism in doing so minimized extensive damage to the M/V SPRAY's electrical and mechanical systems and prevented the total loss of the vessel.

## II. ELEMENTS OF A SALVAGE AWARD

A salvage award is compensation allowed to a volunteer whose services have aided distressed property. The award is not regarded merely as pay or the basis of *quantum meruit* for work and labor performed, but as a reward to persons who voluntarily render their services in salving property, and to encourage others to similarly undertake the saving of life and property. The Blackwell, 77 U.S.1 (1869); The Sabine, 101 U.S. 384 (1879).

Pursuant to the BoatU.S. Salvage Arbitration Plan, various criteria are considered in determining the quantum of a salvage award. In large part, these criteria mimic the 1989 International Salvage Convention which the United States ratified in 1996 as well as the general maritime law on salvage. HRM serially treats each of the criteria below:

### Location Of The Casualty, Weather And Sea Conditions

The salvage was undertaken at a marina. The sea conditions were minimal and weather was not a factor. The tides at the location, however, have a tidal range of four feet (4'). At the time of the salvage, the ebb tide was receding and a flood tide was building which would have resulted in approximately eight feet (8') of water at the slip at which the M/V SPRAY was berthed as reflected in the tide table set forth below:

Historic Tide Data



This amount of seawater depth would have resulted in the total immersion of the Casualty's hull and interior spaces.

<u>Degree Of Risk To Persons And Equipment</u>

The M/V SPRAY was in serious danger at the time HRM commenced performance of its services. When HRM's Captain Casey arrived on scene, the Casualty was sitting low in the water, was without operable bilge pumps, and was heavily flooded with seawater. Further, the Casualty is designed with a partially open transom area such that the seawater ingress would have exponentially increased once the open transom sank sufficiently. In other words, once the trim by the stern settled to a critical point, the Casualty's down-flooding points such as the transom cutaways, portholes, ventilation ports, and other unprotected hull openings would be exposed to the sea and the rate of sinking would further and dramatically increase.[4] The image below of a similar make and model vessel clearly illustrates the design features of the M/V SPRAY's transom which make it particularly susceptible to an exacerbated down-flooding incident:



[4] It is not unreasonable to assume that some down-flooding was already taking place at the time of HRM's arrival due to the water ingress into the vessel having overcome the bilge pumps and what with the vessel owner seeking HRM's assistance.

As respects HRM's personnel, vessels, and equipment, the normal risks attendant to a salvage operation were present.[5] HRM does not contend that it encountered undue risk in performing the salvage. However, HRM's Captain Casey did enter the enclosed interior spaces of the M/V SPRAY in order to deploy a dewatering pump which was necessary so as to prevent an uneven distribution of seawater which could lead to a capsize.

The Extent Of Damage To The Salved Vessel

HRM is hard pressed to quantify with specificity the amount of damage sustained by the Casualty due to the vessel interests' failure to produce the required initial disclosures. Notwithstanding, the Casualty's engines were not overcome with seawater, the Casualty did not sink, and very little electrical damage is contemplated. It is anticipated that any repairs are likely associated with cosmetic issues and the remedying of the flooding source.[6]

Degree To Which The Salvage Operation Mitigated Or Saved Reasonably Anticipated Further Damage To The Salved Vessel

Seawater immersion to fiberglass, mechanicals and electrical systems of recreational vessels almost always results in a constructive total loss. In addition, wood trim, wooden settee lounge seats, cabinets, drawers, etc. warp and become misshapen as a result of seawater immersion.[7] Here, HRM prevented such a flooding incident and preserved significant vessel value. The water depth, the Casualty's vulnerable transom design, and the lack of operable bilge

---

5 As noted by arbitrators Ace J. Blackburn, Jr., Reginald M. Hayden, Jr. and Christian D. Keedy in Offshore Marine Towing, Inc. v. Runnin' Easy 3, Inc., 2004 A.M.C. 2174 (BoatU.S. Arb., Aug. 6, 2004), "In any salvage situation, there is always an overall risk to person and property."

6 It is understood that the source of the flooding was a failed stuffing box. Flooding and sinking at dock is not unusual and, in fact, BoatU.S. reports that 80% of all vessel sinkings occur at the dock. "Not having a bilge pump is a recipe for disaster," says Carroll Robertson, vice president of claims for BoatU.S. Marine Insurance. Eighty-percent of all boats sink tied up to the dock, and sunken boats release substantially greater quantities of oil, fuel, acids and other environmentally harmful substances, she says." (BoatU.S. Magazine (Nov., 2004), *Bilge Pump Ban A Receipe For Sinkings."*)

7 The seawater would also cause upholstery and cosmetic damage including aroma damage to the Casualty's interior spaces. New Bedford Marine Rescue, Inc. v. Cape Jewelers, Inc., 240 F. Supp.2d 101, 111 (D. Mass. 2003).

pumps would necessarily have resulted in the Casualty's total immersion and subsequent loss had HRM not attended on scene.

Time Requirement, Expenses And Degree Of Success Of
The Salvor In Mitigating Or Preventing Damage To The Marine Environment

This factor is always a source of aggravation for the commercial marine salvor. HRM provides professional marine salvage services on a year-round basis. It maintains full-time personnel, expensive purpose-built equipment, licensure, and a myriad of other requirements so as to be able to respond and successfully salvage vessels on a moments notice.[8] Thus, were we to plumb the depths of the "time" associated with any one salvage, it is really only fair to include the months of preparation integral to being able to provide "quick response".

Against that backdrop, HRM recorded one and three-quarters (1.75) hours of actual time responding to this particular incident.

As for mitigation of damage to the marine environment, it is axiomatic that had the M/V SPRAY become swamped, there would have been a free communication between the sea and its 300 gallon fuel tank, and its sewage holding tank. In addition, the sensitive marine environment of the upper Narragansett Bay would have been exposed to the lube oils associated with the Casualty's mechanicals (engines, transmissions, etc.).[9] Thus, it is reasonably concluded that HRM's successful salvage prevented a significant marine pollution event.

---

8 As detailed above at ¶ 2, p. 2, the aggregate value of this infrastructure is in excess of $1.0 Million.

9 "On August 10, 1998 the state of Rhode Island took a step toward ensuring better water quality in marine waters by designated their coastal waters as a No Discharge Area (NDA). The Rhode Island waters include territorial seas within three miles of shore, including all of Narragansett Bay. A No Discharge Area is a designated body of water in which the discharge of *treated* and *untreated* boat sewage is prohibited (this does not include greywater or sink water)." (Rhode Island Dept. Of Environ. Mgmt., Office of Water Resources, http://www.dem.ri.gov/programs/benviron/water/shellfsh/pump/index.htm).

Prevailing Prices For Comparable Salvage Recovery Operations

The instant salvage took place while the Casualty was at berth under circumstances uniquely similar to Magistrate Judge Bowler's decision in New Bedford Marine Rescue, Inc. v. Cape Jewelers, Inc., 240 F. Supp.2d 101 (D. Mass. 2003). Following an exhaustive analysis largely tracking the very facts present in this matter, the Court in New Bedford Marine Rescue, Inc. awarded $11,000.00 or slightly more than eighteen percent (18%) of the vessel's $60,000.00 post-casualty value. Similarly, in Biscayne Towing & Salvage, Inc. v. Kilo Alfa, 2005 A.M.C. 129 (S.D.Fla. Sept. 30, 2004), the Court awarded $10,000.00 or ten percent (10%) of the value saved by the salvor's actions.[10]

Photographs, Video Tapes And Witness Statements

HRM produces as an attachment to the accompanying Declaration of John K. Fulweiler, Esq., a copy of the written statement of its Captain Casey. The written statement was composed two days after the incident and was produced by HRM to the vessel interests as part of its invoicing. The statement provides a description of the services provided and specifically narrates the circumstances surrounding the presentation and execution of the Salvage Contract.

A Copy Of Any Signed Agreement Or Contract

A copy of HRM's Standard Form Marine Salvage Contract signed by the Casualty's owner as well as a copy of the Redelivery Certificate are attached to the accompanying Declaration of John K. Fulweiler, Esq.

Itemized List Of The Salvor's Vessels, Their Value, Personnel And Equipment Utilized

Captain Casey responded to the M/V SPRAY aboard HRM's vessel the "Safe/Sea Salvor". This purpose-built vessel is thirty-five feet (35') in length, powered by two Yanmar

10 This Court adopts a slightly different paradigm in aggregating both the post-casualty vessel value ($80,000) and the cost of raising the vessel had it sunk ($20,000) in reaching a value-saved sum.

inboard diesel engines coupled to Hamilton 274 waterjets, and with an effective range of 360 nautical miles. Built by Almar Boats of Tacoma, Washington, the Safe/Sea Salvor is fully equipped for its sole mission to provide commercial marine assistance in the near-coastal waters of New England. The Safe/Sea Salvor carries a complete complement of salvage equipment. As near as can now be calculated, the replacement value of this vessel and its equipment is approximately $250,000.00.

The Salved Vessel's Pre-Casualty Fair Market Value,
Insured Value, Post-Casualty Pre-Repair Market Value, Any Marine
Condition/Valuation Or Damage Surveys And All Repair Estimates Or Invoices

The vessel owner is in the best position to produce information responsive to this inquiry. It is for this reason that the BoatU.S. Salvage Arbitration Plan mandates that the vessel interests produce this information prior to the commencement of an arbitration.[11] The vessel interests have not done so and their obstinate refusal to *play by the rules* can only be deemed a wrongful attempt to obtain some perceived advantage.

Notwithstanding, based on its research, HRM submits that the post-casualty pre-repair market value of the M/V SPRAY is $61,500.00. HRM calculates this sum by way of its research of the average sale price for vessels of the same make and model. A copy of the supporting documentation attendant to this calculation is attached to the Declaration of John K. Fulweiler, Esq.

[11] As discussed above at page 3, ¶ 14, the Salvage Arbitration Plan is unequivocal in its requirement that this information be produced by the underwriter. Without explanation otherwise, the underwriter has simply refused to do so in this instance.

Party's Summary Conclusions And The Believed
Reasonable Fee Due And Owing For Services Rendered

HRM seeks a salvage award of $11,000.00 as well as $500.00 for the subsequent towage of the Casualty to a repair yard.[12] The $11,000.00 is calculated as being eighteen percent (18%) of the post-casualty value of the M/V SPRAY and is fully supported by the jurisprudence. The $500.00 towage reflects HRM's standard hourly rates for the movement of the Casualty from the location of its emergency haul-out to a repair yard.

In addition to the $11,000.00 salvage award, HRM seeks an award of interest at the rate of 1.5% per month beginning thirty (30) days after the salvage (October 23, 2006) and running until payment of the award as specifically called for by the terms of the Salvage Contract and as set forth in HRM's October 9, 2006 invoice.

HRM also seeks an award of its attorneys' fees and costs incurred in seeking collection of payment. The Salvage Contract specifically states "*salvor . . . shall also be entitled to any costs incurred in collection of payments due hereunder including reasonable attorneys' fees.*" (See Salvage Contract, ¶ 7, annexed to Fulweiler Decl.) As near as can now be calculated (and which will be supplemented in its rebuttal submission) HRM calculates it has incurred $2,699.60 in attorneys' fees and costs to date.

The arbitrators' fees in this matter cannot exceed a maximum cost of $1,575.00 for each party per the terms of the Salvage Arbitration Plan. HRM seeks an award of its arbitrators' fees up to the maximum amount.

Finally, HRM seeks an equitable uplift given its judicially-recognized status as a professional salvor. It is well accepted that a professional salvor is entitled to a more liberal

[12] This towage occurred after the Casualty was hauled from the water and relates to the movement of the Casualty to an upstream repair yard on September 25, 2006. A copy of the HRM invoice relating to the same is annexed to the Declaration of John K. Fulweiler, Esq.

award than a chance salvor since a professional salvor possesses unique skills and must maintain expensive equipment particularly suited for dangerous work. B.V. Wijsmuller v. United States, 702 F.2d 333 (2d Cir. 1983); H.R.M. Inc. v. S/V MARTINA MIA II, 1992 AMC 1347, 1350 (1991 arbitration ); Bindon v. Jones 1986 AMC 1403, 1405 (W.D. Wa. 1984). Accordingly, HRM seeks an equitable uplift of ten-percent (10%) of the salvage award.

## CONCLUSION

The tired refrain of the vessel interests following a successful salvage is one of revisionist history. Whether it be that the vessel was never in peril, or that the owner did not know he was agreeing to salvage, there is a regrettable lack of appreciation for the salvor's efforts. Until the advent of the commercial marine assistance industry, competent on-the-water assistance was non-existent. Now, a vessel owner need only hail and a salvage vessel is on scene in moments. Such was the instant circumstance and given the costs of maintaining a business capable of rendering such services, HRM's demand for a salvage award fully supported by the jurisprudence should have been met with prompt payment. If revisionist history is the perspective *du jour*, to whom would the Casualty's owner have turned to for assistance if not HRM? How much would the insurer have paid in raising the Casualty and in mitigating pollution? What would the insurer have paid to the owner as a result of the Casualty's constructive total loss?

HRM's salvage award is fully supported by the general maritime law and it respectfully requests that this Arbitration Panel award it all of its requested relief.

Dated: April 9, 2007
New York, NY

DEORCHIS, WIENER, & PARTNERS, LLP
Attorneys for Petitioner

By: ______________________
John K. Fulweiler, Esq.
61 Broadway, 26th Floor
New York, NY 10006
212-344-4700 - Tel.
212-422-5299 - Fax
jfulweiler@marinelex.com - E-mail

To: VIA FEDERAL EXPRESS

BOATU.S. CONSUMER PROTECTION BUREAU
369 Benton View Dr.
Philomath, OR 97370
Attn.: Ms. Caroline Ajootian, AVP, Director

# EXHIBIT B

**Petitioner's Salvage Award Presentation**

Case No.: 06-1228

---

H.R.M., INC. D/B/A SAFE/SEA,

Petitioner,

vs.

M/V SPRAY, *her engines, tackle, apparel, furnishings, equipment, etc.*, and DAVID PICKERING,

Respondents.

---

## PETITIONER'S REBUTTAL ARBITRATION SUBMISSION

### Introduction

The vessel interests in this case (under the stage management of the vessel's insurer) have truly acted unjustly and in bad faith. Leaving the attorney rhetoric aside, there is plain evidence of repeated and unexplained delays, a willful refusal to act in a manner consistent with this arbitration's rules, and a blatant misrepresentation of various facts. This is a simple matter that could long ago have been resolved and may likely have been resolved without arbitration had the vessel interests dealt with H.R.M., Inc. ("HRM") in good faith. They did not, they never wished to, and now we are in the midst of an expensive and time consuming fray -- perhaps that was their intent all along.

Whatever the case, the vessel interests' initial submission is, in the words of the famous detective Nero Wolfe, "pfui". It is built on misrepresentations and it utterly fails to undermine

HRM's entitlement to a salvage award. It should be rejected *in toto* and HRM should be awarded all of the relief it seeks.[1]

I. The Proffered Initial Submission Should Be Rejected As Unreliable Based On Numerous Factual Misrepresentations

HRM, as part of its normal protocol, records various telephone and marine radio traffic. HRM possesses and produces herewith audio recordings (and accompanying transcripts) associated with the instant claim. These audio recordings raise serious questions as to the veracity of the vessel owner's (David W. Pickering) affidavit. For ease, we highlight in outline form some of the core misrepresentations.

(A) *"I would like to make clear, that at no time did I feel the M/V SPRAY was in danger of sinking."* (Respondents Initial Submission, Exhibit "A", ¶ 16)

Oh no? In the initial telephone call seeking assistance, Pickering engaged in the following exchange within seconds of reaching HRM:[2]

> HRM: **And its taking on water?**
>
> Pickering: **Yeah. I don't know how much or how fast. I just arrived at the boat and it's up to the floor boards <u>so I gotta move fairly quickly</u>.**
>
> (Audio Transcript, p. 4) (Emphasis added)

(B) *"Although the local BoatU.S. representative, the operator never advised that the services would not be covered under the plan . . . . "* (Respondent's Initial Submission, Exhibit "A", ¶ 11)

---

[1] The Respondents' assertion of a state law claim for alleged unfair and deceptive business practices is completely without support and should be rejected in its entirety based on HRM's Initial Submission and the instant Rebuttal. (Respondents' Initial Submission, p. 14)

[2] Contradictions abound. For instance, Pickering's affidavit works hard at creating an aura of routine ease when it states he called HRM directly. The inference is that the circumstances were benign. In reality, Pickering called the BoatU.S. national emergency dispatch center who immediately contacted HRM. (Audio Transcript One.)

Really now? In the initial telephone call seeking assistance, HRM's employee specifically discussed how this event would be invoiced:

> HRM: **Okay. That's fine. Just to let you know this is not going to be covered under your BoatU.S. towing policy.**
>
> Pickering: **Okay. I'm sure the insurance will cover it.**
>
> HRM: **Yeah, we consider it a salvage and it's put through your insurance company, exactly.**[3]

(Audio Transcript, pp. 4-5)

(C) *"I was under the impression that it was a standard form [addressing the salvage contract] and that there would be coverage under the BoatU.S. plan, as was the case with my previous dealing with Safe/Sea . . . ."*

Were you really? This assertion is untenable when, in fact, HRM's carefully trained employee specifically discussed with Pickering the nature of the job, the necessity of signing a salvage contract, and the manner in which the salvage claim would be calculated:

> HRM: **Okay and the only thing that you are required to do is to sign a salvage contract, okay?**
>
> Pickering: **I am happy to do that.**
>
> HRM: **Okay, no problem.**
>
> ***
>
> Pickering: **I know that there is going to be a charge for pumping the boat, but what can I expect so that I am prepared?**

---

[3] Furthermore, in a telephone call several days later, Pickering jovially confirms that his insurance company has confirmed coverage for the salvage explaining, in part, as follows: *" [S]he [M/V SPRAY's insurer] pulled my policy up and she was familiar with it and she said 'yes' that is part of the claim that once there is a problem with the boat and the claim gets filed, everything from the salvage where the boat was pumped which you folks did, all the way to until the boat is ready to go back into the water . . . she says the policy covers everything. That was refreshing to hear."* (Audio transcript, p. 9)

HRM: **I don't know. I honestly don't know. It actually isn't a standard cost, it goes by a percentage of your boat's value.**

Pickering: **Okay.**[4]

***

Pickering: **My boat is worth $60,000.00.**

HRM: **Yeah. It is a percentage of that. I don't handle that. My boss handles that. I just get all the information and go from there.**

Pickering: **Okay, my friend. I appreciate your help.**

***

Pickering: **I can't just pay for his time and the pumping of the water?**

HRM: **No. That is not how it works in the marine industry. It's a salvage claim with your vessel and I guess they would be happy to**

Pickering: **Okay, my friend and one of your boats is in route?**

HRM: **Yeah, he said that he is about five minutes from Apponaug Harbor . . . .**

(Audio Transcript, pp. 5-6)

(D) *"[I] believe that the operator took advantage of the situation by not fully disclosing the method of charging for these services."* (Respondents' Initial Submission, Exhibit "A", ¶ 18)

Come again? The dialogue set forth above illustrates that HRM explained exactly how it intended to charge for its services and how it intended to calculate it salvage charge. Pickering's statement otherwise is completely baseless, wrong, misrepresentative and an after-the-fact

[4] Compare this admission to Pickering's stage managed affidavit wherein he states "[T]he operator never advised that the services would not be covered under the plan, and did not advise that compensation would be based upon the value of the M/V SPRAY." (Respondent's Submission, Exhibit "A", ¶ 11)

assertion designed to somehow undermine HRM's claim for salvage. Not only should the assertion be rejected, but it is so patently revisionist that it should be rejected along with the rest of the affidavit.

This vessel owner's affidavit, to be blunt, not only strains credulity but suggests perjury.

II. Respondents' Have Not Submitted Any Evidence Which Supports Departing From The 18% Award Provided To The Salvor In The Nearly Identical Lawsuit *New Bedford Marine Rescue, Inc. v. Cape Jeweler's, Inc.*

The facts in New Bedford Marine Rescue, Inc. v. Cape Jewelers, Inc., 240 F. Supp. 2d 101 (D.Mass. 2003) largely track the instant circumstances. The Respondents' submission (even with its revisionist efforts) fails to meaningfully distinguish the instant event from the dockside sinking scenario at issue in the Cape Jewelers, Inc. decision.

Even by the leanest comparison, the similarity between the decisions provides ample precedent for an eighteen percent (18%) award in the instant matter:

- Both vessels secured to a dock at a marina.
- Both vessels flooding with seawater from stuffing boxes. (We assert that flooding aboard the M/V SPRAY was from additional sources as well.)
- Both vessels flooded with substantial amounts of water at time salvor arrived.
- Both vessels without operable bilge pumps.
- Both vessels with a fair market value of $60,000.00.
- Both salvors properly identified as professional salvage companies.

In light of the vessel value, the services performed and this precedent, HRM asserts that an award of eighteen percent (18%) is reasonable and just.

III. <u>The Standard Form Marine Salvage Contract Is Enforceable</u>

There is no basis for the vessel interests' assertion that the standard form marine salvage contract is somehow unenforceable. Even if Captain Casey was mute (which he is not nor was he on the date of the incident), HRM's office personnel fully explained the nature of the salvage service which it intended to provide. If Pickering had not preferred the manner in which HRM intended to contract, he could have sought other assistance. He did not. In fact, prior to the Respondent's submission, he never objected to any aspect of HRM's performance much less its invoice. To the contrary, when Pickering learned that Captain Casey would be returning to the marina to tow the M/V SPRAY to a repair facility, Pickering stated: *"Oh, he was the one that was right here. He was terrific."*[5] (Audio Transcript, p. 10)

The vessel interest's suggestion that HRM had some duty to instruct Pickering to contact his insurer, is nonsense. (Respondents' Initial Submission, p. 9) HRM advised Pickering of the details of its intended performance and that it intended to submit its invoice to Pickering's insurer. There is nothing in the record evidence to suggest that Pickering could not have contacted his insurer if he did not understand HRM's proposal or if he otherwise wanted to confirm coverage. By way of this assertion, the insurer is simply whining.

Finally, the vessel interests' failure to seek a declaratory judgment as to the enforceability of the salvage contract and its acquiescence to the terms contained therein (namely its agreement to arbitrate) amounts to a waiver. *See, e.g.,* <u>International Longshoremen's Association, AFL-CIO</u>

---

[5] On that point, the vessel interests are also wrong. (Respondents' Initial Submission, p. 13) The subsequent towage of the M/V SPRAY was not covered under the BoatU.S. Plan as is plainly evident from the following language quoted from the plan (a full copy of which is annexed to the Supplemental Decl. of John K. Fulweiler, Esq.): *Service provides for the commercial towing of your disabled boat from the point of breakdown at sea to your port of choice; at sea battery jumpstarts, delivery of fuel, engine fluids and basic engine parts necessary to avoid a tow, subject to availability; ungrounding assistance for a soft ungrounding; and towing of your disabled boat from a restricted use dock to your port of choice for the purpose of making repairs. A restricted use dock is one from which you are required to move immediately, i.e. fuel or restaurant docks and docks without overnight facilities.*

v. Hanjin Container Lines, Ltd., 727 F. Supp. 818 (S.D.N.Y. 1989). The vessel interests have waived the right to raise this assertion.

III. The M/V SPRAY Was In Peril & HRM Is Entitled To A Salvage Award

**HRM was never provided with information regarding vessel repairs**

First, HRM was never previously provided with documentation relating to the repairs undergone. HRM requested this information long before it demanded arbitration. Further, the vessel interests were obligated to provide this information pursuant to the Salvage Arbitration Plan. (Salvage Arbitration Plan, p. 3) They never did, and they offer no explanation otherwise. Without such information, HRM was left to divine the post-casualty value of this vessel in a vacuum.

**The Vessel interests are secreting a survey report**

Second, that documentation which the vessel interests produced in connection with the initial submission is redacted and incomplete. There is, to continue our blunt candor, the heavy-handed imprint of the insurer selectively producing documentation associated with the vessel's surveys. Consider the fact that, at least, two (2) surveys were taken of this vessel following the incident. However, the vessel interests produce only a single "estimate" by Brewer Yacht Yard at Cowesett -- suspiciously bearing the "Received" stamp of the other surveying company, New England Marine Surveyors:



So as to undermine any "reasonable" explanation for the absence of the New England Marine Surveyor's Report, HRM's principal contacted New England Marine Surveyors and was told that (a) it surveyed the M/V SPRAY following the incident; and (b) that it issued a report. Why was this report withheld from disclosure contrary to the Salvage Arbitration Plan's requirements? HRM suspects, among other things, that it was withheld because it is not as generous in the estimated repairs and because it supports the existence of peril. Specifically, HRM's principal was told by New England Marine Surveyors that it identified three separate sources of seawater flooding! (See Andrews Affidavit annexed to Fulweiler Suppl. Decl.)

**The Brewer Yacht Yard estimate should not be part of any post-casualty value calculus**

Third, the Brewer Yacht Yard document is a mere "estimate". The vessel interests have completely failed (and, arguably, have frustrated) the disclosure of evidence identifying repairs actually performed to the M/V SPRAY. There is no record evidence of the actual repairs undertaken, if any. Furthermore, by reason of the failure to earlier produce the Brewer Yacht Yard documentation (as well as the New England Marine Surveyors' report), HRM has been unable to adequately investigate the so-called "repairs" to determine what, if any, were related to the sinking and what were a product of neglect and lack of upkeep as is evidenced by the multiple references to various systems aboard the M/V SPRAY as being "severely rusted", and "corroded".

The BoatU.S. Salvage Arbitration Plan imposes the burden on the vessel interests to produce evidence associated with repair damages. (Salvage Arbitration Plan, p. 3) In this case, the vessel interests have not carried their burden in that they have produced a mere estimate and have otherwise secreted probative documentation relating to the same.

Accordingly, the M/V SPRAY's post-casualty value should be determined to be $60,000.00.

**The Affidavit of Michael Collyer is unreliable and should be rejected**

The Affidavit of Michael Collyer is a self-serving and wholly unreliable document. There is no explanation of what "independent research" was undertaken nor any revelation as to the contours of the same. To what did he refer? What formed the basis of his calculation as to vessel value? Why did he fail to inspect the M/V SPRAY? In addition, Collyer was not provided with the secreted document from New England Marine Surveyors and instead relies solely on the Brewer Yacht Yard quote!

Furthermore, Collyer's armchair "opinion" as to peril is completely unsupportable. Consider that Collyer never visited the facility, never interviewed any persons, does not allege some kind of intimate knowledge of the berthing location and, worse still, bases his opinion as to peril on Pickering's revisionist narrative. Contrary to Pickering's own statements (*"I just arrived at the boat and it's up to the floor boards so I gotta move fairly quickly."*) Collyer wrongly assumes that time was "not of the essence." Under nearly identical facts, the U.S. District Court for the District of Massachusetts found the vessel "Memories" was unequivocally in peril.

It is for these reasons, that Collyer's opinions are not trustworthy, are unreliable and should be rejected in their entirety.

IV. HRM Is Entitled To The All Of The Relief It Seeks

**HRM's Salvage Award Demand Calculation**

| | | |
|---|---|---|
| (1) | Salvage award | $11,500.00 |
| (2) | Interest (1.5%/month fm. 10/23/2006) | Arb. Panel To Calculate |
| (3) | Attorneys' Fees & Costs | $4,636.28 |
| (4) | Arbitration Expenses | $1,575.00 |
| (5) | Equitable Uplift | Arb. Panel To Determine |

**CONCLUSION**

HRM asserts that this arbitration panel needs to do the difficult job of making an example of the vessel interests and their stage manager, the insurer. This claim did not need to be arbitrated. If the insurer had simply produced documentation and engaged in a meaningful dialogue, HRM (and its legal counsel) are confident that an amicable resolution could have been reached.

What is needed now is an award which tempers this kind of wrongful conduct in the future. The award must address the vessel interests' bad faith which is plainly supported by objective evidence, and it must address this kind of after-the-fact massaging of the facts. HRM does not want nor expect a windfall, but it expects justice and justice must take the form of stern language and a salvage award which includes of all of the salvor's attorneys' fees and costs, interest, and arbitration expenses.

This is a small claim, but the importance of the award which must issue could be great.

Dated: May 7, 2007
New York, NY

DEORCHIS, WIENER, & PARTNERS, LLP
Attorneys for Petitioner

By: ______________________________

John K. Fulweiler, Esq.
61 Broadway, 26th Floor
New York, NY 10006
212-344-4700 - Tel.
212-422-5299 - Fax
jfulweiler@marinelex.com - E-mail

To: VIA FEDERAL EXPRESS

BOATU.S. CONSUMER PROTECTION BUREAU
369 Benton View Dr.
Philomath, OR 97370
Attn.: Ms. Caroline Ajootian, AVP, Director

# EXHIBIT C

BoatU.S.

# SALVAGE ARBITRATION PLAN

BoatU.S.

BOAT OWNERS ASSOCIATION OF THE UNITED STATES

# Boat Owners Association of The United States
# Salvage Arbitration Plan

## TABLE OF CONTENTS

**Overview**
Plan Benefits . . . . . 1
Costs and Time Involved . . . . . 2
**Before Arbitration** . . . . . 2
Duty of Utmost Good Faith & Full Disclosure . . . . . 3
Salvage Billing Practices . . . . . 3
Percentage Billings . . . . . 3
Independent or Subcontractors . . . . . 4
Standard Form Salvage Contracts . . . . . 4
Payment of Salvor's Bill . . . . . 5
**Arbitration Process and Procedure** . . . . . 5
Request to Convene a Panel . . . . . 6
Arbitration Fees and Expenses . . . . . 6
Administrator Duties . . . . . 7
Presentation of the Salvage Case . . . . . 8
**Arbitration Decision** . . . . . 10
General Duties of Panel . . . . . 12
Arbitration Guiding Principals . . . . . 12
**Arbitrators** . . . . . 13
Listing Critera . . . . . 14
Code of Ethics . . . . . 14
**Plan Management** . . . . . 15
**Miscellaneous Terms of Agreement** . . . . . 15

© 2003 Boat Owners Association of The United States
880 South Pickett Street, Alexandria, VA 22304
Office of Salvage Arbitration 703-461-2856
Fax: 703-461-4674

# I. Boat Owners Association of The United States Salvage Arbitration Plan—Overview

Inherent in every business transaction is the risk of a dispute. Boat Owners Association of The United States (the Association) sponsors this Salvage Arbitration Plan as a low cost, time efficient, equitable dispute resolution system for the recreational boating community. It is structured in a manner that strives to provide the parties an objective, unbiased legally supportable outcome.

When a dispute arises and negotiations fail, either party may request an arbitration panel be convened. Upon mutual agreement to use this Plan, the parties are legally bound by the decision of the arbitration panel. Each party presents their case in writing. No in-person testimony is used. Each party has the opportunity to submit a written rebuttal to the case presented by the opposing side. The arbitration panel reviews the cases and decides a fair and reasonable settlement. The parties are sent a copy of the Award that includes the settlement amount and an explanation of the decision.

Each party to the dispute selects an arbitrator from the list of arbitrators maintained by the Association. These arbitrators are marine professionals with experience in the salvage of recreational boats. Parties to the dispute are free to choose from the Admiralty Attorney List or the Marine Professionals List when they select an arbitrator. The two arbitrators then must select the Arbitration Panel Chairman from the Attorney List, assuring proper application of the law.

## A. Plan Benefits

Participants in this Plan are benefited by:

- an arbitration panel comprised of marine professionals who apply their knowledge and understanding of recreational boat salvage
- an Admiralty Attorney as the panel Chairman assuring proper application of law
- a speedy resolution of the dispute
- sharply reduced cost, in comparison to court proceedings as well as other available arbitration plans
- an Award supported by the fully reasoned, written opinion

## B Costs and Time Involved

The arbitration fees are split equally between the two parties. The maximum cost per party is $1,575.00 . There are no travel or hearing costs, or additional legal expense associated with this plan. Fees are collected at the end of the procedure (no pre-arbitration set up costs).

The following chart outlines the time involved in resolving the dispute and notes the amount of time allowed for the various stages of the process. This plan provides for a quick resolution with the average procedure concluded within 84 days.

| | |
|---|---|
| Day 1 | Agreement to Arbitrate submitted |
| Day 14 | Deadline for arbitrator selection |
| Day 42 | Deadline for submitting case presentation |
| Day 56 | Deadline for submitting rebuttal |
| Day 84 | Award decided by panel |
| Immediately upon receipt | Award decision distributed to all parties |

# II. Before Arbitration

## A. Duty to Utmost Good Faith and Full Disclosure

1. All parties shall deal fairly, honestly and with utmost good faith in the handling of salvage operations, salvage contracts, and negotiations seeking a just and reasonable payment for salvage services.

2. Wherever information must be disclosed such as the conditions under which the salvage operation was performed, the value of the Yacht, insurance coverage or the basis of the salvage billing, all information shall be completely and fully disclosed.

## B. Salvage Billing Practices

1. Upon completion of the job and delivery to a safe port, Salvor shall present to the Underwriter's Agent and/or the salved vessel's Owner a billing for services rendered. The bill must be on the basis of a flat contract price, or time and equipment in accordance with published rates, or based on a percentage of after-salvage, pre-repair fair market value of the vessel or property saved, whichever was agreed to at the time the salvage took place. Salvor should include with the billing any background information regarding the salvage operation that supports the amount of the bill presented.

2. If requested by the Salvor, or in the event of any disagreement over the reasonableness of the Salvor's billing, the Underwriter (or an uninsured Owner, if applicable) shall disclose, without prejudice, the pre-casualty current market value and insured value of the salved vessel and its equipment as well as the believed post-casualty, pre-repair fair market value "as is" (after salvage but before repairs). Any supporting information or opinions obtained from a marine survey of the yacht or repair facility estimates or invoices shall also be disclosed as soon as practicable. Any Coast Guard or Marine Patrol accident reports shall also be provided to Salvor if requested.

## C. Percentage Billings

1. In the event Salvor pursues a claim based on a percentage of the salved vessel's post casualty value, the billing shall include an explanation of the basis of the claimed percentage, the post casualty, pre-repair value, and the way in which yacht's valuation was determined.

2. For the purposes of calculating percentage billing of the post casualty value, the amount shall be based upon the post-casualty, pre-repair value of the salved vessel. Pre-repair valuation may be calculated by subtracting the reasonable cost of restoring the salved vessel to its pre-casualty condition, according to accepted marine repair practices, from the pre-casualty fair market value. It should exclude the costs of salvage and towing to a suitable repair yard, but take into account any damages caused or contributed to by the Salvor during the recovery operation.

3. The joint survey for the purpose of arriving at the post-casualty, pre-repair value of the salved vessel, while not required, is encouraged wherever a dispute arises as to valuation.

## D. Independent or Subcontractors

1. Salvor shall disclose any independent or subcontractors hired which were involved in the salvage operation and whose services are included as part of the bill presented.

2. Any compensation owing to any subcontractor retained by Salvor shall be the sole responsibility of the Salvor with no obligation of the Owner or Underwriter to pay this subcontractor directly. Salvor hold harmless and agrees to indemnify the Owner and Underwriter from any claim by such subcontractor for payment.

## E. Standard Form Salvage Contracts

1. This Arbitration Plan is available for any salvage dispute as mutually agreed between the parties, regardless of what contract form is used by the Salvor. The Boat Owners Association of The United States Standard Yacht Salvage Agreement is available for use in any marine salvage operation, such as high dry grounding or stranding with imminent risk of loss of life or property or damage to a protected marine environment, but is not required.

2. The Salvor shall present his contract or agreement to the Owner or master of the salved vessel and obtain an agreement to proceed with the salvage prior to commencing any recovery effort, wherever possible. In the event of clear danger to life or property (e.g. perilous at-sea conditions or immediate and substantial risk of life and property), Salvor may engage in stabilizing efforts prior to presenting the agreement. Once the situation is stabilized, the agreement should be produced and finalized upon before any further salvage or towing operations are undertaken.

## F. Payment of Salvor's Bill

1. After good faith review of the billing, the salved vessel's Underwriter (or the Owner, if uninsured) shall promptly pay the Salvor the agreed upon amount, but in any event (absent an extension of time granted by the Salvor) no later than fifteen (15) days from the date the yacht is delivered afloat or ashore and the bill is delivered to the Owner or Underwriter as mutually agreed. In the event of disagreement over the bill, and an inability to resolve any disagreement, arbitration should be promptly requested.

2. The Underwriter shall deliver to the Salvor a copy of the declarations page of the subject insurance policy and a Letter of Undertaking agreeing to pay, without prejudice, an amount up to one and one-half (1.5) times the presented bill, subject to policy limits, with full disclosure of any reservations or rights for policy coverage defenses which might affect Underwriter's payment of the bill.

3. In the absence of any reservation of rights for policy coverage defenses, the Salvor shall accept Underwriter's Letter of Undertaking as security for any maritime lien and in lieu of any arrest or attachment of the Yacht. The Letter of Undertaking shall serve as bond for payment of any salvage claim award, including but not limited to interests and costs.

4. In the event the Yacht is not insured or Underwriter's Letter of Undertaking contains a policy reservation of rights not withdrawn on or before the thirtieth (30th) day following delivery of the Yacht, Salvor may resort to all legal remedies to assure collection of fees from the Yacht and/or its Owner or may agree with Owner to accept owner's surety bond and/or convene arbitration under this Plan.

# III. Arbitration Process and Procedure

## A. Request to Convene a Panel

1. In the event the parties to any billing dispute cannot reach an agreement on the reasonable fees for services rendered, and when the parties have agreed by stipulation or otherwise to arbitrate under the Association's Arbitration Plan, the parties may request that Arbitration be convened. A request to convene Arbitration may be made at any time but should generally be requested only after good faith negotiations between the parties have been exhausted.

2. Notice of the request for arbitration shall be sent in writing to all interested parties and to the Boat Owners Association of The United States Office of Salvage Arbitration, 880 South Pickett Street, Alexandria, VA 22304. Upon receipt of the request for arbitration, the Administrator will send the "Agreement to Arbitrate" form to both parties. Submission of the form constitutes an agreement that this arbitration is final and binding on all parties and in lieu of any legal or other proceedings. If either party fails to submit the "Agreement to Arbitrate" form within five (5) days, the Administrator will advise both parties to pursue appropriate legal remedies. The parties agree that the Award issued as a result of their case may be published by Boat Owners Association of The United States and/or its correspondents.

3. All parties to Arbitration must select an arbitrator from the current list of the Association's Arbitrators (or agree to a sole Arbitrator selected from the Admiralty Attorney List) within fourteen (14) days of the Administrator's notice of a request to convene a Panel. If either or both parties fail to timely select an Arbitrator, and an "Agreement to Arbitrate" form has been filed by both parties, the Administrator shall select one at random for such party from the current list of Arbitrators and shall so advise each party in writing. In such an event, the panel shall be three (3) members and not a sole arbitrator. If no "Agreement to Arbitrate" has been submitted, the parties will be advised to pursue appropriate legal remedies.

## B. Arbitration Fees and Expenses

All fees and expenses of the Arbitration Panel and the Arbitration Administrator shall be equally between the parties to arbitration. The maximum amount any party to this arbitration process would pay is **$1,575.00** . The fee schedule is as follows:

1. Each Arbitrator shall be paid an hourly fee of $100 for a maximum of seven (7) hours time, plus expenses.

2. The Arbitration Panel Chairman shall be paid an hourly fee of $125 for a maximum of twelve (12) hours time, plus expenses.

3. The Arbitration Administrator shall be paid a flat fee of $250

4. Arbitrator's direct expenses shall be limited to photocopying at 25 cents per page, mailing charges, telephone or fax charges. Travel is not necessary to render a decision. Other expenses are subject to review by the Administrator. Payment of the arbitrators' direct expenses are made by the Administrator and are not the responsibility of the parties to arbitration.

5. In the event the parties agree to a sole Arbitrator to resolve the dispute, the sole Arbitrator will be selected from the Association's current arbitrators list of Admiralty Attorneys. This Arbitrator shall be entitled to the same rate and expenses as that of a Chairman with a maximum of fifteen (15) hours time and the Administrator fee shall be reduced to $125.

## C. Administrator Duties

1. The Administrator shall be an employee designated by the Consumer Affairs Office of Boat Owners Association of The United States and shall have no involvement or interest in the salvage claim. The Administrator is responsible for clerical functions and has no input into the decision making process of the Arbitration Plan.

2. The Administrator shall maintain a current listing of all available arbitrators; a file on all Plan Awards; and any correspondence or documents received in the course of Arbitration business to be retained for a period of not less than 3 years.

3. The Arbitrator will make available to anyone requesting it a list of active arbitrators and copies of this Plan.

4. Upon receipt of a request to convene a panel, the Administrator shall promptly notify the parties of the request, send the "Agreement to Arbitrate" form to the parties, and request selection of an arbitrator to sit on the panel. (If no "Agreement to Arbitrate" is received, the Administrator will advise both parties to pursue appropriate legal remedies.) If either or both parties fail to timely select an Arbitrator, and an "Agreement to Arbitrate" has been filed, the Administrator shall select one at random for such party from the current list of Arbitrators and shall so advise each party in writing.

5. After selection is complete, the Administrator will next notify each Arbitrator in writing of their selection and instruct them to choose an Arbitration Panel Chairman from the Association's current arbitrators list of Admiralty Attorneys. The Administrator shall promptly notify the chairman of such selection and distribute to each member of the panel a copy of the Plan, arbitration deliberation guidelines and any other documents useful to their work.

6. The Panel members shall submit a signed statement acknowledging to what extent, if any, they have a conflict which would prevent them from fully and fairly evaluating the case. This statement will also require the arbitrator to agree to remain impartial and fair and honest throughout the arbitration.

7. The Administrator will notify the parties of the panel selection and monitor the panel's business to ensure a timely decision is rendered.

8. The Administrator shall receive and distribute as appropriate all correspondence and documents during the course of Arbitration. **All communication between the parties to arbitration and the panel shall be directed through the Administrator once the panel is convened.**

9. The Administrator shall provide all parties with a copy of the Award and any assessed Arbitration fees and expenses.

10. The Administrator shall oversee timely payment of the Award and any billings and shall be empowered with Power of Attorney and confession of Judgment in any court of competent jurisdiction to seek collection of the Award or billings due hereunder. A failure of either party to promptly pay an Award or assessment shall result in that party's forfeiture of any benefits or protection of the Plan. The Administrator is empowered to instruct the Underwriter or (Owner if uninsured) to offset any administrative assessment against the Salvor in the Award payment and have such assessed fee included in the Underwriter's assessment payment.

**11. The parties to the Arbitration may communicate with each other throughout the Arbitration process. If the parties reach a settlement on their own while the Arbitration is in progress, the parties will pay the Arbitration Panel members and the Administrator for their services at the stated hourly rate, up to the maximum allowed.**

## D. Presentation of the Salvage Case

1. Each party to Arbitration shall prepare in writing and deliver to the Administrator within fourteen (14) days of submission of the Agreement to Arbitrate, five (5) copies of a presentation of its position in regard to the reasonable amount believed due and owing for the salvage services performed. Upon receipt of the case presentation from both parties, the Administrator will promptly distribute copies to the Arbitration Panel and the other party to Arbitration. Rebuttal information, if any, must be delivered to the Administrator within fourteen (14) days of receipt of the opposing party's case presentation. A party may petition the Chairman (through communication with the Administrator only) for an extension of any time deadline herein and such extension shall be granted only for good cause shown by the petitioning party.

2. The Case Presentation shall include, where appropriate, the following:

   a. A summary of the salvage operation including, but not limited to, the following:

      (1.) location of the casualty and prevailing weather and sea conditions throughout the recovery operation;

      (2.) degree of risk to persons and equipment;

      (3.) the extent of damage to the salved vessel believed caused in the incident or as believed caused by the salvage operation;

      (4.) degree to which the salvage operation mitigated or saved reasonably anticipated further damage to the salved vessel;

      (5.) time requirement, expenses and degree of success of the salvor in mitigating or preventing damage to the marine environment;

(6.) Prevailing prices for comparable salvage recovery operations and awards, and hourly salvage rates in that region;

(7.) Photographs, video tapes and witness statements believed helpful to render a decision on the reasonable compensation for salvage services performed;

b. A copy of any signed Agreement or contract together with a copy of all documents or a summary of oral contractual arrangements between the salved vessel's owner or master and any Salvor and/or Salvor subcontractors involved in the recovery operation;

c. An itemized listing of the Salvor's vessels and their value, personnel and equipment utilized in the recovery operation together with an itemization of time expended and any out of pocket cost incurred for such crew or equipment;

d. The salved vessel's pre-casualty fair market and insured value, post-casualty pre-repair market value, any marine condition/valuation or damage surveys and all repair estimates or invoices;

e. Party's summary conclusions and the believed reasonable fee due and owing for services rendered. **Disclosure of settlement discussion information is deemed improper and is not to be submitted**

3. All case presentations shall be accomplished through the mail. No in-person presentation of the case nor any out of town travel by the Panel members shall be necessary. The Chairman is encouraged to convene a conference call meeting of the Panel before rendering a final decision.

# IV. Arbitration Decision

## A. General Duties of Panel

1. The Arbitration Panel shall promptly review all presented materials. The Chairman may request additional information for clarification from either or both parties. This request, as well as the response, must be in writing and communicated through the Administrator. Copies of the request and response will be distributed to all Panel members and both parties to the arbitration by the Administrator.

2. The Chairman or his/her designee shall issue a written decision and Award within twenty-eight (28) days after receiving a rebuttal from either or both parties and/or any supplemental information requested, which ever is provided later. The Arbitration panel shall weigh all appropriate information provided in a full and fair light and may reject any untimely presentation.

3. Generally a salvage operation is performed on a "No Cure, No Pay" basis, however, the Award should give special compensation for the costs of removal of the wreck and pollution prevention, containment or clean up in the event the saved property is later deem a constructive total loss ("CTL"). A CTL is defined herein as the reasonable repair costs exceeding the lesser of insured value or the fair market value of substantially similar boat. Recovery (salvage and/or towing) expense shall not be considered in a CTL calculation. Due consideration shall be given to a partially successful savings of the yacht, its equipment, stores or cargo. This special compensation shall be payable only if no salvage award is made.

## B. Arbitration Guiding Principles

The Panel shall consider a Guiding Principles for their decision on a reasonable Award the following criteria:

1. salved vessel's post-casualty valuation;

2. weather, seas and other marine conditions immediately prior to, during and following the salvage recovery operations which relate to the danger to the property;

3. degree of risk to persons or property during the recovery effort;

4. skill, experience, promptness and expertise of salvor;

5. time, equipment and expenses expended by salvor in rendering the salvage service; and losses, if any incurred by the salvor;

6. the time, equipment & expenses expended by the salvor to mitigate or prevent environmental damage;

7. measure of success, extent of damage mitigated as a result of or caused by the salvage effort;

8. value, readiness and efficiency of salvor's vessels and equipment;

9. prevailing prices and awards for comparable salvage recovery operations and hourly or per foot salvage rates in that region.

# V. Arbitrators

## A. Listing Criteria

1. Criteria for approved listing shall include a minimum of five (5) years experience in salvage related profession. This includes, but is not limited to, operator/crew of salvage operation, damage appraisal, claims adjusting or Admiralty law practice. The arbitrator must be of highest moral, ethical, personal and business reputation.

2. Listing as one of the Plan's "Approved Arbitrators" shall be by application submitted to the Consumer Affairs office of Boat Owners Association of The United States. This office shall appoint an annual steering committee of at least three members who shall approve or disapprove their inclusion in the listing

## B. Code of Ethics

1. No Arbitrator may serve on a particular case panel who has in any manner participated in the subject salvage recovery operations or its investigation, or who has any financial interest in the Award. It is the responsibility of such Arbitrator or any participant in that Arbitration case to immediately advise the Administrator of any conflict in order that a substitute Arbitrator can be selected. A failure by a party to an Arbitration case to advise of a conflict of interest within ten (10) days of convening the panel shall waive such objection by that party. A failure of the Arbitrator to personally excuse himself/herself from a particular case due to such conflict (independent of any request by a party) may result in permanent dismissal of such Arbitrator form the Approved List and a rejection of any fees or expenses submitted by that Arbitrator in connection with any pending cases.

2. No Arbitrator shall discuss with the party appointing him/her regarding the selection of the Panel Chairman. Once the Panel is complete, all communications between the parties to arbitration shall be through the Administrator. All verbal communication must be confirmed in writing. None of the Arbitrators are to directly communicate with any of the parties to Arbitration.

3. Arbitrators must remain impartial and abide by the principles of honesty and fair dealing.

4. Arbitrators must sign an "Arbitrator's Agreement" for each case on which they serve, affirming their lack of conflict of interest.

5. Boat Owners Association of The United States shall govern all disciplinary matters involving the Approved Arbitrator Listing.

## VI. Plan Management

The Plan shall be managed and directed by the Chairman of Boat Owners Association of The United States through its Consumer Protection Bureau.

## VII. Miscellaneous Terms and Agreement

This Salvage Arbitration Plan is sponsored by Boat Owners Association of The United States for use by mutual agreement of any parties to a recreational boat salvage dispute. The pre-arbitration and arbitration procedures and guidelines outlined in this booklet shall be followed by any participants. Use of this plan is voluntary. As such, participants agree to hold harmless sand indemnify Boat Owners Association of The United States for any loss or damage arising out of this arbitration process from whatever cause including negligence of employees.

Boat Owners Association of The United States

## STANDARD FORM YACHT SALVAGE CONTRACT

It is hereby agreed this ______ day of ____________, 19 ______, at ______ hours at

______________________ (Location) by and between: ______________________ (Owner or Captain)

for the Yacht named "______________________ (Vessel)," which is described as a

______________________ (yr - manufacturer - length) and insured by: ______________________ ("Underwriter") and

______________________ (Salvage Company/Salvor), to salvage the yacht under these terms and conditions:

1. Salvor agrees to render assistance to and endeavor to save said yacht and its property and deliver her afloat or ashore at ______________________ marina or port as mutually agreed, or to nearest safe port if unspecified herein, as soon as practicable.

2. Salvor shall have the requisite possession and control of the subject yacht and be entitled without expense to the reasonable use of the yacht and its gear in the performance of recovery or salvage operations.

3. Said salvage and any towage services by the Salvor shall terminate upon delivery of said yacht as designated herein. Owner and Underwriter shall be responsible for any storage, towing or other port or marina charges following delivery and for risk of loss thereafter.

(a) NO CURE/NO PAY (Compensation, including special compensation, to be determined under ARTICLES 13 and 14, SALCON 89, and U.S. Admiralty Law.)

INITIALS __________ (salvor) / __________ (owner)

(b) NO CURE/NO PAY, AT A FIXED PRICE of $

INITIALS __________ (salvor) / __________ (owner)

(c) NO CURE/NO PAY at $__________/per hour/per day/per vessel (or in accordance with SALVOR's published rates, initialed and attached hereto).

INITIALS __________ (salvor) / __________ (owner)

(d) OTHER:

**********

*This Agreement is for use in the rescue of a boat suffering a serious marine peril such as fire, sinking, stranding or high and dry grounding. A copy of this Agreement and any billing should be sent to the Underwriter's Agent as rapidly as possible. The performance of salvage services hereunder are neither recommended nor approved by Boat Owners Association of The United States.*

*@ 2003 — Boat Owners Association of The United States*
*880 South Pickett Street, Alexandria, VA 22304*
*(permission to reprint without alteration is granted)*

**Continued other side**

4. Compensation to Salvor for the services performed hereunder shall be in accordance with a billing and any supportive analysis of the salvage operation to be presented to Owner and Underwriter's agents upon completion of salvage. Billing to be calculated on the basis specified in No. 3. No agreement on price or its reasonableness has been made at the scene unless agreed to in writing.

5. Services hereunder are rendered on a "No Cure, No Pay" basis; however, salvor shall be entitled to a reasonable allowance for prevention or minimization of environmental damage in accordance with Articles 13 & 14 of the 1989 International Convention on Salvage, as well as for clean up or wreck removal in the event the vessel is deemed a constructive total loss. Payment is due promptly upon presentation of Salvor's bill. Interest at the rate of one and one-half (1.5%) per-cent per month (or the maximum legal rate allowed) shall accrue on any unpaid balance from 30 days after completion of salvage and presentation of a salvage bill, or as determined in accordance with the findings of any Arbitration Award.

6. In the event of any dispute regarding this salvage or concerning the reasonableness of any fees or charges due hereunder, all parties agree to binding local arbitration utilizing individual(s) expe-rienced in maritime and salvage law. The Boat Owners Association of The United States Salvage Arbitration Plan, though not required, is available as a public service through Boat Owners Association of The United States wherever the parties agree to its use. In the event Owner is unin-sured for payment of these services, Salvor may, at its election, agree with Owner to use any agree-able arbitration system or to proceed with all available legal remedies to recover sums believed due and owing.

7. It is understood that services performed hereunder are governed by the Admiralty and Maritime Jurisdiction of the Federal Courts and create a maritime lien against the yacht or its posted securi-ty. Salvor's lien shall be preserved until payment. Salvor agrees in lieu of arrest or attachment to accept from the yacht's Underwriter, a Letter of Undertaking for an amount equal to one and one-half (1.5) times the presented billing with a copy of the insurance policy and coverage information. If the yacht is uninsured or its Underwriter cannot provide a Letter of Undertaking, Salvor may demand the posting of a Surety Bond with its designated Escrow Agent in an amount equal to 1.5 times the Salvor's bill. Salvor may satisfy collection of fees or charges hereunder by recourse to any security posted and shall be entitled to any costs incurred in collection of payments due here-under including reasonable attorneys fees subject to the findings of any arbitration.

8. Salvor hereby warrants that it is acting on its own behalf and on behalf of any subcontractors retained by Salvor to perform services in the recovery or delivery of the yacht. Salvor shall be responsible for any such subcontractors' compensation.

9. In the event the Salvor has already rendered salvage services to the described yacht prior to execution of this contract, the provisions of this contract shall apply to such salvage services.

**SIGNED:** ______________________ ______________________

Salvage Company
Print Name & Address:

______________________
______________________
______________________

Phone: (____) ____-______
Fax: (____) ____-______

Owner/Captain or Owner's Agent
Print Name & Address:

______________________
______________________
______________________

Phone: (____) ____-______
Fax: (____) ____-______

**Boat Owners Association of The United States**
**Office of Salvage Arbitration**
*Washington National Headquarters*
880 South Pickett Street, Alexandria, VA 22304
703-461-2856 Fax: 703-461-4674 www.BoatUS.com